UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 5-15-20

VINCENT WU, DYLAN ARANA, GRIFFIN
BRANHAM, KEITH DEZMIN, PHIL MAY,
DANIEL MCBRIDE, JEFF O'TOOLE,
ADAM PATTACHIOLA, SEONG-YOUP
SUH, JOHN TWIGG, THOMAS WEILAND
and KELLY WILLIAMS SCHELL,

               Plaintiffs,

             v.

BITFLOOR, INC. and ROMAN
SHTYLMAN,

               Defendants.

No.  19-CV-238 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

## INTRODUCTION

      Plaintiffs Vincent Wu, Dylan Arana, Griffin Branham, Keith Dezmin, Phil May, Daniel McBride, Jeff O'Toole, Adam Pattachiola, Seong-Youp Suh, John Twigg, Thomas Weiland, and Kelly Williams Schell brought this action against Defendants Bitfloor, Inc. and Roman Shtylman, alleging that Defendants committed commodities fraud in violation of Section 6(c)(1) of the Commodities Exchange Act ("CEA"), 7 U.S.C. § 9(1), and Regulation 180.1(a) thereunder, 17 C.F.R. § 180.1(a), in addition to violating New York State law.

      Plaintiffs, all customers of Bitfloor, allege that Defendants made false or misleading statements and omissions regarding Bitfloor's operations and that reliance on those statements and omissions caused Plaintiffs to suffer economic losses.

Before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint ("FAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  In light of the fact that Plaintiff's CEA claim is time-barred, the motion is granted.

## FACTUAL BACKGROUND

Except where otherwise noted, the following facts are drawn from Plaintiffs' FAC, the documents attached thereto, and the documents incorporated by reference.  *See Faber v. Metro. Life Ins. Co.*, No. 08 Civ. 10588 (HB), 2009 WL 3415369, at *1 n.1 (S.D.N.Y. Oct. 23, 2009) ("In considering a motion to dismiss, the Court may consider documents attached as an exhibit to the complaint or incorporated into the complaint by reference, [and] documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference . . . ."), *aff'd*, 648 F.3d 98 (2d Cir. 2011).  These facts are assumed to be true for purposes of this motion.  *See Myun–Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 65 (2d Cir. 2018).

## I.     Parties

Bitfloor is a New York corporation with its principal place of business in New York.[1] FAC, Dkt. 45, ¶ 13.  Bitfloor was incorporated in 2011 as an online exchange platform where customers could trade virtual currencies, including Bitcoin.  *Id.* ¶¶ 18-19.  Customers could buy and sell Bitcoin through Bitfloor, but could also hold their Bitcoin (and other currencies, including traditional fiat currencies) in digital "wallets" that functioned similarly to bank accounts.  *Id.* ¶¶ 20-21.  Bitfloor charged customers fees for its services.  *Id.* ¶ 21.  Shtylman owns, operates, and controls Bitfloor as its Chief Executive Officer.  *Id.* ¶ 14.

---

[1] The parties dispute whether Bitfloor still exists as a corporate entity.  *Compare* FAC ¶ 32 ("Bitfloor stated it was no longer in business.  However . . . Defendants renewed their ownership of 'bitfloor.com' with Namecheap.com . . . ."), *with* Defs.' Mot. to Dismiss ("Defs.' MTD"), Dkt. 22, at 1 (noting Bitfloor is "a now defunct corporation"), *and* Defs.' Reply in Supp. of Mot. to Dismiss, Dkt. 31, at 3 ("The fact that someone later renewed ownership of the bitfloor.com domain name is wholly irrelevant to whether New York dissolved the company.") (citation omitted).

Plaintiffs are residents of New York, other states, Canada, and the United Kingdom.  *Id.*
¶¶ 1-12.  Plaintiffs "bought, sold, and held bitcoin at Bitfloor from time to time."  *Id*. ¶ 21.
Plaintiffs allege that they presently "hold" various amounts of Bitcoin in their Bitfloor wallets
that they are "not able to access or sell."  *Id.* ¶¶ 1-12.

## II.    Bitfloor's Closure

By June 2012, Bitfloor had grown to become the fourth-largest Bitcoin exchange in the
world.  *Id.* ¶ 33; FAC Ex. 1 ("Bitcoin Magazine Report") at 1.  However, on April 19, 2013,
*Bitcoin Magazine* reported on an announcement by Shtylman (the "2013 Shutdown
Announcement") that Bitfloor would "cease all trading operations indefinitely."  Bitcoin
Magazine Report at 2.[2]  The 2013 Shutdown Announcement stated that Bitfloor's closure was
due to the closure of its U.S. bank account by its banking partner, Capital One, which meant that
it could "no longer provide the same level of USD deposits and withdrawals as [it had] in the
past."  *Id.*  Accordingly, the 2013 Shutdown Announcement stated that "[o]ver the next days"
Bitfloor would "be working with all clients to ensure that everyone receives their funds."  *Id.*

Plaintiffs allege that they did not receive any notice from Bitfloor concerning the 2013
Shutdown Announcement and that they are not aware of any other Bitfloor customer who
received such notice directly from Bitfloor.  FAC ¶ 28.  In addition, Plaintiffs allege that
"Defendants did not return the phone calls from the Plaintiffs," although they do not plead any
facts regarding the dates of or circumstances surrounding those purported phone calls.  *Id.* ¶ 31.

---

[2] Although Plaintiffs dispute the facts alleged in the Shutdown Announcement and dispute receiving the Shutdown
Announcement at the time it was made, FAC ¶ 28, they do not dispute that the Shutdown Announcement was
printed in *Bitcoin Magazine* on or about April 19, 2013, *id*. ¶ 26.  Moreover, Plaintiffs attach the Shutdown
Announcement as an exhibit to the FAC, and "[a] complaint is also deemed to include any written instrument
attached to it as an exhibit."  *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (internal quotation
marks and citations omitted).  The Court therefore accepts as true that the Shutdown Announcement was published
in Bitcoin Magazine on or about April 19, 2013.

Plaintiffs further allege that Defendants "deliberately closed their site making it impossible for Plaintiffs to contact Defendants and/or recover their property." *Id.* ¶ 34.

### III. Shtylman's Courtesy Letter to NYDFS

On January 10, 2018, Shtylman, through his prior counsel, submitted a letter to the New York Department of Financial Services ("NYDFS") in response to a consumer complaint made to NYDFS regarding "Bitfloor.com." FAC ¶ 32; FAC Ex. 2 ("Courtesy Letter") at 1.[3] The Courtesy Letter stated:

- "Bitfloor.com is the former website of the former company, Bitfloor, Inc.," which "effectively ceased operations on April 21, 2013" after Capital One ended its services. "Bitfloor made a public announcement of this fact on its website and in numerous emails sent to Bitfloor customers." Courtesy Letter at 1. "Bitfloor operated in wind-down mode for some period of time thereafter, processing withdrawals of bitcoins and returning US dollar deposits to previous Bitfloor customers that it was able to identify." *Id.*

- Bitfloor "was dissolved in August 2016." *Id.* A record of dissolution from the New York State Department of State, Division of Corporations indicating that Bitfloor was dissolved on August 31, 2016 was attached to the Courtesy Letter. *Id.* at 1, 3-4.

- "Notwithstanding Bitfloor's best efforts, approximately $59,000 in US dollar deposits was unable to be returned to Bitfloor customers. This money was on deposit with the Internet Archive Federal Credit Union in 2016, until that bank closed operations and the money in Bitfloor's account there was forfeited to the US government." *Id.* at 1.

- "Following this forfeiture, and the return of bitcoins to Bitfloor's customers, Bitfloor was dissolved," and therefore "there is no longer a Bitfloor entity that has funds or bitcoins to

---

[3] The complaint was made by a "Mr. Jeff O'Toole." It appears that this is the same individual now before the Court as a plaintiff.

redress [the] complaint.  Moreover, Mr. Shtylman has no specific recollection of [the] complainant's] account or his attempts to withdraw his bitcoins, which is not surprising given the amount of time that has passed since the events alleged in [the] complaint." *Id.*[4]

## PROCEDURAL HISTORY

Plaintiffs commenced this action by filing the initial complaint on January 11, 2019.  Dkt. 4.  Defendants moved to dismiss the initial complaint on April 16, 2019.  Dkt. 22.  After the parties completed briefing on Defendants' motion to dismiss, Dkts. 29-31, the Court granted Plaintiffs leave to file an amended complaint and provided that the parties could file supplemental briefing on Defendants' pending motion to dismiss, Dkt. 41.  Plaintiffs filed the First Amended Complaint—the operative complaint in this action—on June 28, 2019.  Dkt. 45. The parties then submitted supplemental briefing on Defendants' motion to dismiss.  Dkts. 46-48.

In the First Amended Complaint, Plaintiffs plead violations of the Commodities Exchange Act and the regulations promulgated thereunder, as well as various New York State statutory and common law claims including breach of contract, conversion, fraud, deceptive business practices in violation of New York State's General Business Statute § 349, breach of fiduciary duty, loss of opportunity, negligent misrepresentation, unjust enrichment, and bailment/constructive trust.  *See* FAC ¶¶ 51-82.

---

[4] Plaintiffs do not dispute the fact that Shtylman made the statements in the January 18, 2018 Courtesy Letter, FAC ¶ 32, and attach the Courtesy Letter to the FAC, including the record of dissolution attached thereto, *id*. at Ex. 2. The existence of the Courtesy Letter and record of dissolution are therefore accepted as true for the same reason that the existence of the 2013 Shutdown Announcement is accepted as true.  *See supra* note 2.

## LEGAL STANDARD

### I.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In making this determination, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Moreover, on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### II.    Motions to Dismiss Under Federal Rule of Civil Procedure 9(b)

Federal Rule of Civil Procedure 9(b) has a heightened pleading standard, requiring that a plaintiff alleging fraud "state with particularity the circumstances constituting" the alleged fraud. Fed. R. Civ. P. 9(b).  "The Second Circuit has not decided whether, as a general rule, CEA claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 176 n. 245 (S.D.N.Y. 2018); *see also Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *30 (S.D.N.Y. Feb. 21, 2017) ("Courts apply Rule 9(b)'s pleading requirements to the CEA on a case-by-case basis."). Courts in this district, however, have held that "[w]hether or not the heightened pleading

standard of Rule 9(b) of the Federal Rules of Civil Procedure applies" to CEA claims "depends

on the conduct alleged." *Dennis*, 343 F. Supp. 3d at 176.  Where, as here, the plaintiffs'

"allegations suggest fraudulent conduct on defendants' part," the "CEA claims are subject to the

heightened pleading requirements of Rule 9(b)." *Id.*  To satisfy the requirements of Rule 9(b),

"the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir.

2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

## DISCUSSION

Plaintiffs allege that Defendants fraudulently misled Bitfloor's customers about how the

exchange operated and ultimately closed and, in so doing, induced Plaintiffs to entrust their

money to Defendants in violation of the CEA and Regulation 180.1(a).  FAC ¶¶ 29-50.  These

alleged fraudulent acts include, *inter alia*, that "[Bitfloor] did not send its [2013 Shutdown

Announcement] to the Plaintiffs" and that "Defendants did not return the phone calls from the

Plaintiffs." *Id.* ¶¶ 30-31.  In addition, Plaintiffs allege that the Courtesy Letter "was false in that

it stated Defendants had 'forfeited' money to the US treasury although in fact the Treasury took

that money to hold for its true owners" and that Bitfloor was dissolved "by proclamation of the

state when in fact that happened because Defendants voluntarily failed to pay franchise taxes,"

which caused New York to declare Bitfloor "'inactive' (meaning dissolved)." *Id.* ¶ 32.  Plaintiffs

further allege that Defendants made solicitations of Bitfloor customers to grow the business. *Id.*

¶ 33.  In sum, Plaintiffs assert that "[b]y their statements Defendants intentionally lulled the

Plaintiffs into failing to apply to Defendants for a return of their property until the Defendants,

by their own admissions, deliberately closed their site making it impossible for Plaintiffs to

contact Defendants and/or recover their property." *Id.* ¶ 34.  They further assert that "Defendants

continue to hold property which they know is not their property and have failed to escheat it to the State of New York or any other jurisdiction in which the Plaintiffs reside as required by law." *Id.* ¶ 37.

For the reasons that follow, the Court finds that Plaintiffs' Commodities Exchange Act and Regulation 180.1(a) claim is time-barred under the applicable statute of limitations and declines to exercise jurisdiction over Plaintiffs' state law claims.

## I.      Plaintiffs' Commodities Exchange Act Claim is Time-Barred

The Commodities Exchange Act or CEA "is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 101 (2d Cir. 2019) (citation omitted). "Section 6(c)(1) of the CEA makes it 'unlawful for any person . . . to use or employ, . . . in connection with any swap, or a contract of sale of any commodity, . . . any manipulative or deceptive device.'" *Id.* (quoting 7 U.S.C. § 9(1)).  Regulation 180.1(a), promulgated under the CEA, provides that it is "unlawful for any person . . . in connection with any swap, or contract of sale of any commodity," to "[u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud," 17 C.F.R. § 180.1(a)(1), "[m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading," *id.* § 180.1(a)(2), "[e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person," *id.* § 180.1(a)(3), or "[d]eliver or cause to be delivered . . . a false or misleading or inaccurate report concerning . . . market information or conditions that affect or tend to affect the price of any commodity in interstate commerce," *id.* § 180.1(a)(4).

CEA claims must be brought "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014) (citation omitted). "Dismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'" *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 474 (S.D.N.Y. 2016) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)). "A complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sierra Club*, 911 F.3d at 88 (internal quotation marks and citations omitted). Plaintiffs, however, "need not allege a specific . . . date to survive a motion to dismiss because Defendants, not Plaintiff[s], bear the burden of proof on the affirmative defense of the statute of limitations." *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 182 (S.D.N.Y. 2007); *see also Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013) (denying motion to dismiss on statute-of-limitations grounds where "the Complaint contain[ed] no information as to the [relevant dates]" and the dates were not otherwise referenced in properly considered documents).

Defendants argue that Plaintiffs' claim is time-barred because Plaintiffs should have been aware that they could not access their accounts once the Bitfloor site shut down in April 2013, but Plaintiffs failed to bring their claim until January 11, 2019—nearly six years later. *See* Defs.' Mot. to Dismiss ("Defs.' MTD"), Dkt. 22, at 2; Defs.' Suppl. Reply, Dkt. 46, at 2-4. Plaintiffs dispute that their CEA claim is time-barred, but do not specify when they believe their

CEA cause of action accrued, arguing instead that "the date when Plaintiffs knew of their injury is a fact question awaiting further development as this action proceeds." Pls.' Opp. at 3-5.

As the parties appear to agree, the "discovery accrual rule" applies to Plaintiffs' claim under the CEA, which is otherwise silent on when a cause of action accrues. *See Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 536 (2019). Under the rule, "discovery of the injury, not discovery of the other elements of a claim . . . starts the clock" for purposes of the statute of limitations. *Id.* at 108 (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). Even when a plaintiff lacks "actual knowledge" of the injury, where "'the circumstances known to' a plaintiff, 'as alleged in the complaint, were such as to suggest to a person of ordinary intelligence' that she has been defrauded, 'a duty of inquiry' may arise that commences the CEA's two-year limitations period." *Id.* at 109 (quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994)). In other words, "[a] plaintiff's knowledge of the injury may be imputed in situations where the plaintiff had a duty of inquiry." *Shak*, 156 F. Supp. 3d at 473-74 (S.D.N.Y. 2016) (citing *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 697-98 (S.D.N.Y. 2013) [hereinafter *LIBOR I*], *vacated and remanded on other grounds sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016)). For the reasons that follow, the Court holds that Plaintiffs had inquiry notice of their injury more than two years before they filed their initial complaint on January 11, 2019, and that their CEA claim is therefore time-barred.

### A.  Actual Knowledge

In *Levy*, the Second Circuit held that, on the basis of the allegations in the plaintiff's complaint, the plaintiff had "actual knowledge" of her injury when "prices started to fall for no apparent reason" in "an extraordinary, unprecedented and unjustified sudden collapse" for which

there was "no explanation . . . other than market distortion due to manipulation." *Levy*, 917 F.3d at 109 (citations omitted).  Unlike in *Levy*, however, it is unclear from the face of the FAC when Plaintiffs acquired "actual knowledge" of their injury.  Defendants argue that "Plaintiffs specifically allege . . . in the FAC that the Bitfloor exchange site shut down at the latest in April 2013," Defs.' Suppl. Reply, Dkt. 46, at 4 (citing FAC ¶¶ 23, 26, Ex. 2), and that Plaintiffs "allege that since at least April 2013 'the Defendants stopped communicating with Plaintiff[s],'" *id.* (citing FAC ¶ 18).  Yet Defendants mischaracterize the FAC.  The FAC does not, in fact, allege the specific dates when Defendants shut down the site, when Plaintiffs first realized they could not access the site, or when Plaintiffs tried unsuccessfully to communicate with Defendants. Instead, the FAC alleges that the website was active "until at least January 15, 2013" without stating when or how Plaintiffs first discovered that the site was no longer active.  FAC ¶ 23.  The FAC also asserts that "the Defendants stopped communicating with Plaintiff[s]," FAC ¶ 18, and "[t]he Defendants did not return the phone calls from the Plaintiffs," without stating when or to what number such phone calls were placed, FAC ¶ 31.  Although Plaintiffs attach to their FAC the April 19, 2013 Bitcoin Magazine Report, which states that Bitfloor would "cease all trading operations indefinitely," Bitcoin Magazine Report at 2, Plaintiffs assert that they "did not receive the notice from Bitfloor," FAC ¶ 28.  Accordingly, it is unclear when Plaintiffs first discovered the 2013 Shutdown Announcement or otherwise first learned about the closure of Bitfloor, and thus obtained "actual knowledge" of their injury.  In any event, for the reasons that follow, Plaintiffs were on inquiry notice more than two years prior to initiating this action.

### B.  Inquiry Notice

Even where a plaintiff lacks actual knowledge of an injury, the "plaintiff's knowledge of the injury may be imputed in situations where the plaintiff had a duty of inquiry; the date on

which such knowledge is imputed to the plaintiff turns on whether and how the plaintiff discharged that duty." *Shak*, 156 F. Supp. 3d at 473 (citing *LIBOR I*, 935 F. Supp. 2d at 698). "Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard.  This objective determination can be resolved as a matter of law." *Staehr*, 547 F.3d at 427 (citations omitted).  A duty of inquiry arises when "'the circumstances known to' a plaintiff, 'as alleged in the complaint, were such as to suggest to a person of ordinary intelligence' that she has been defrauded." *Levy*, 917 F.3d at 109 (quoting *Benfield*, 26 F.3d at 22).  "If the plaintiff thereupon proceeds to make no inquiry, knowledge of the injury is imputed at the time the duty arose, and the limitations period begins at that point.  If, however, the plaintiff makes an inquiry, the limitations period starts to run from the date that a reasonably diligent inquiry should have revealed the fraud." *Shak*, 156 F. Supp. 3d at 474 (citing *LIBOR I*, 935 F. Supp. 2d at 698).

        In commodities fraud cases, courts often conduct the inquiry notice analysis in the context of market manipulation claims.  Such determinations necessarily turn on whether a plaintiff should have known that a given market was subject to fraud or was otherwise artificial—not simply whether the plaintiff lost money.  *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 705 ("[I]t is sufficient that plaintiffs knew that the LIBOR quotes defendants submitted did not reflect their actual expected borrowing rates, and thus that the prices of plaintiffs' Eurodollar contracts, based on LIBOR, were artificial."); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 573-74 (S.D.N.Y. 2016) (noting plaintiffs who alleged manipulation of a benchmark for silver may have been on inquiry notice based on a CFTC Commissioner's statement "suggesting possible manipulation of various commodity benchmarks").  Said another way, the relevant inquiry in market manipulation cases is not when a plaintiff sold a contract or

commodity at a loss, but rather when a plaintiff should have discovered that some market participant fraudulently distorted the relevant market, thereby causing the loss.

For example, in *Shak*, the plaintiff traders brought CEA claims based on the defendant's alleged manipulation of the long-dated silver futures market, which purportedly led plaintiffs to liquidate their silver futures contracts in early 2011. *Shak*, 156 F. Supp. 3d at 469-72. The court found these claims time-barred because the plaintiffs' complaints "unavoidably suggest, if not outright assert, that in early 2011, plaintiffs were well aware—and in any event easily could have learned through publicly available data" who had allegedly defrauded them. *Id.* at 474. Similarly, in *Benfield*, the Second Circuit held that the plaintiff had a duty to inquire when, after paying $1,800 for a single call option on silver for which "he was given virtual assurances of profit," he lost his entire investment within four months. *Benfield*, 26 F.3d at 22-23. Such a "loss within a matter of months in a highly recommended investment should have caused eyebrows to raise" and "imposed upon [the plaintiff] a duty of inquiry" that would have disclosed the defendant's conduct. *Id.* at 23.

Unlike the CEA claims in those cases, Plaintiffs' allegations against Bitfloor involve an alleged injury that is based not on market distortion but on the relatively simple misappropriation of assets that, according to Plaintiffs, are akin to bank deposits. *See* FAC ¶¶ 17, 20. It is nonetheless appropriate for the framework from the market distortion CEA cases to guide the analysis here.

With these standards in mind, the Court concludes that the facts alleged in the FAC and the exhibits attached thereto would have suggested to a person of ordinary intelligence that she had been defrauded as early as April 2013, when *Bitcoin Magazine* reported Shtylman's announcement that Bitfloor would "cease all trading operations indefinitely," but no later than

13

August 31, 2016, when publicly-available New York State Division of Corporations records indicate that Bitfloor was dissolved.  *See* FAC ¶¶ 26-27, Ex. 1, Ex. 2; *cf. Behrens v. JPMorgan Chase Bank N.A.*, No. 16-cv-5508 (VSB), 2019 WL 1437019, at \*6 (S.D.N.Y. Mar. 31, 2019) (finding that the CEA "limitations period[] began to run at the earliest in October 2008, and at the latest on July 10, 2012").  Plaintiffs allege that they previously "bought, sold, and held bitcoin at Bitfloor from time to time," FAC ¶ 21, but are no longer "able to access or sell" the Bitcoin in their Bitfloor wallets, FAC ¶¶ 1-12, despite Defendants' prior assurances that Bitfloor users could "access, transfer, and withdraw Bitcoin using Bitfloor at any time." *Id.* ¶ 23.  The loss of such abilities, combined with the alleged lack of any communication from Defendants, would surely "have caused eyebrows to raise" and suggested to customers of ordinary intelligence that they had been defrauded.  *Benfield*, 26 F.3d at 23; *cf. Sewell v. Bernardin*, 795 F.3d 337, 340-42 (2d Cir. 2015) (construing statute of limitations periods under the Computer Fraud and Abuse Act and the Stored Communications Act to begin when plaintiff discovered she could not access a particular AOL or Facebook account).  Despite the fact that the 2013 Shutdown Announcement suggests that Plaintiffs lost access to their accounts in or around April 2013, Plaintiffs waited until January 11, 2019—over five and a half years later—to commence this action.

Like Plaintiffs here, the plaintiff investor in *Rodriguez Canet v. Morgan Stanley & Co.*, 419 F. Supp. 2d 90 (D.P.R. 2006), argued that her fraud action was not time-barred because she was unaware that changes to her investments had occurred years earlier.[5]  The *Rodriguez Canet*

---

[5] Although *Rodriguez Canet* involved fraud claims under the Securities Exchange Act, it nonetheless informs the Court's analysis with respect to this CEA claim.  *See In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 672 (S.D.N.Y. 2016) ("[T]he CFTC has stated that it is 'guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5.'" (quoting *In re Total Gas & Power N. Am., Inc.*, CFTC No. 16-03, 2015 WL 8296610, at \*8 (Dec. 7, 2015))).

plaintiff claimed her financial advisor made an unauthorized investment on her behalf in 1999 that resulted in steep losses from December 2000 to August 2001. *Id.* at 92. She nonetheless waited to file a fraud action until September 2004 and, in response to the defendants' statute of limitations defense that her monthly statements "constituted sufficient 'storm warnings' to trigger her duty of 'diligent inquiry,'" asserted that she never received the statements. *Id.* at 95. The court held that her fraud claim was time-barred, noting:

> In effect, plaintiff is saying that she failed to examine the status of her account during the more than 15 years that she held it. It is elementary that any reasonable investor would take steps to periodically ascertain the status of his/her account. Plaintiff cannot merely sit back and hope for the best; she had at a minimum, a duty to keep abreast of how her investments were performing.

*Id.* The court found that the plaintiff's failure to monitor her investments was in conflict with her stated investment purposes, noting that "[t]he depleted condition of the account was patently irreconcilable with plaintiff's instructions for conservative management and for it to generate a 'stable source of income.'" *Id.* at 96.

Plaintiffs here ask this Court to countenance a comparable lack of diligence. Plaintiffs disclaim any awareness of the closure of their Bitfloor accounts in 2013, Pls.' Opp. at 4, despite the fact that "any reasonable investor would take steps to periodically ascertain the status of his/her account." *Rodriguez Canet*, 419 F. Supp. 2d at 95. Moreover, Plaintiffs' allegation that they "bought, sold, and held bitcoin at Bitfloor from time to time"—which implies that they traded virtual currency with at least some regularity—is similarly irreconcilable with their apparent failure to realize that Bitfloor had been shut down more than five years before they initiated this action. FAC ¶ 21. Accordingly, the Court concludes that a duty of inquiry arose in April 2013, at the earliest, and August 31, 2016, at the latest, when Plaintiffs "easily could have learned through publicly available data" of their alleged injury. *Shak*, 156 F. Supp. 3d at 474.

15

If Plaintiffs did not inquire into their injury, "knowledge of the injury is imputed at the time the duty arose, and the limitations period begins at that point." *Shak*, 156 F. Supp. 3d at 474 (citing *LIBOR I*, 935 F. Supp. 2d at 698). If Plaintiffs conducted an inquiry, however, "the limitations period starts to run from the date that a reasonably diligent inquiry should have revealed the fraud." *Id*. Plaintiffs allege that they placed phone calls to Defendants on an unspecified date, FAC ¶ 31, and thus appear to have conducted at least a minimal inquiry. Yet regardless of when Plaintiffs may have placed certain phone calls, any "*reasonably diligent* inquiry should have revealed the fraud*," *Shak*, 156 F. Supp. 3d at 474 (emphasis added) (citations omitted) no later than August 31, 2016—the date on which Bitfloor dissolved according to the publicly-available records from the New York State Division of Corporations, and more than three years after Defendants publicized that it would "cease all trading operations indefinitely" in *Bitcoin Magazine*. *See* FAC Ex 1 & Ex. 2, at 3. As described above, the Court accepts as true the existence of the April 2013 Shutdown Announcement and the August 2016 New York State Divisions of Corporation records, both of which were attached as exhibits to the FAC and are thus included within the FAC's four corners. *See Sierra Club*, 911 F.3d at 88; *see also Staehr*, 547 F.3d at 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters."). Given that Plaintiffs did not conduct a reasonably diligent inquiry, the CEA's two-year statute of limitations bars Plaintiffs' CEA claim on August 31, 2018 at the latest. As the initial complaint was not filed until more four months later, on January 11, 2019, the Court holds that Plaintiffs' CEA claim is time-barred.

Defendants also raise compelling arguments to the effect that Plaintiffs' CEA claim must be dismissed on the merits, as Plaintiffs' "threadbare allegations simply parrot only some of the necessary elements of such a claim." Defs.' MTD at 10-11. In light of the fact that Plaintiffs' CEA claim is time-barred, however, the Court declines to address whether Plaintiffs have plausibly alleged a CEA violation.

## II.   New York Common Law and Statutory Claims

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). The Supreme Court has commented that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). "In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998).

The Court finds that such factors counsel in favor of declining supplemental jurisdiction over the remaining state claims in this case. Accordingly, the Court dismisses such claims without prejudice. *See Behrens*, 2019 WL 1437019, at *9; *Galanova v. Portnoy*, No. 19-cv-1451 (JGK), 2020 WL 201714, at *8 (S.D.N.Y. Jan. 13, 2020).

17

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss the CEA claim as time-barred and declines to exercise jurisdiction over Plaintiffs' state law claims.  The Clerk of Court is respectfully directed to terminate the motion at Docket Entry 22 and close this case.

SO ORDERED.

Dated:     May 15, 2020
           New York, New York

_____
Ronnie Abrams
United States District Judge